FILED
COURT OF APPEALS
DIVISION II

2015 FEB -3 AM 8: 56

STATE OF WASHINGTON
BY _____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45083-6-II |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| JOSHUA DAVID CHARLES RHOADES, | |
| Appellant. | |

BJORGEN, A.C.J. — Joshua David Charles Rhoades appeals from his conviction and exceptional sentence, following a jury trial, for second degree assault. Rhoades argues that (1) the trial court's jury instruction on an aggravating circumstance, different from that alleged in the information, violated his due process right to notice of the nature and cause of the accusation, and (2) the court's recklessness instruction relieved the State of its burden on an essential element of the crime. Rhoades also submits a statement of additional grounds for review under RAP 10.10, arguing that the trial court erred by (3) denying him a continuance, (4) improperly admitting gang evidence, and (5) allowing certain venire members to serve on the jury. Rhoades also argues in his statement of additional grounds that (6) he received ineffective assistance of counsel and (7) prosecutorial misconduct deprived him of a fair trial.

Because Rhoades did not receive constitutionally adequate notice of the specific aggravating circumstance on which the State sought an exceptional sentence, we reverse the exceptional sentence and remand for resentencing within the standard range. We otherwise affirm.

## FACTS AND PROCEDURAL HISTORY

The State charged Rhoades with second degree assault, based on conduct against Dustin McLean, under two alternative prongs of the assault statute: that Rhoades intentionally assaulted McLean and recklessly inflicted substantial bodily harm, and/or that he assaulted McLean with a deadly weapon. As an aggravating circumstance, the State alleged in the information that Rhoades "committed the offense to obtain or maintain his or her membership or to advance his or her position in the hierarchy of an organization, association, or identifiable group, contrary to RCW 9.94A.535(3)(s)." Clerk's Papers (CP) at 2.

### I. PRETRIAL PROCEEDINGS

Prior to trial, the State moved to admit "evidence relating to [Rhoades's] gang affiliation . . . as proof of motive" under ER 404(b). CP at 9-13. The trial court granted the State's motion in part, ruling evidence of Rhoades's gang affiliation admissible, as well as "[e]xpert testimony regarding gang culture and background relating to LVL,"[1] but excluding "[e]vidence specifically related to defendant's prior bad acts in association with his gang affiliation." CP at 20-21; Verbatim Report of Proceedings (VRP) (Apr. 3, 2013) at 6-10.

At a hearing one week before trial began, Rhoades declined to confirm the trial date and requested a continuance on the grounds that he had not had the opportunity to interview McLean, had just learned that one of Rhoades's associates would testify against him as part of a plea deal, and had just received additional police reports concerning the case. The court denied the request to postpone the trial, but ordered the State to make McLean available for an interview.

---

[1] LVL are the initials for "Lil Valley Lokotes," the gang to which the State alleged Rhoades belonged.

2

Rhoades again moved for a continuance immediately before voir dire, stating that, in light of his interview with McLean, Rhoades wished to obtain the testimony of an additional witness, Ashley Huner.[2] The court denied the motion on the ground that delay would prejudice the State because some of its witnesses were in protective custody.

During voir dire, one member of the venire acknowledged knowing the investigating officer "well enough to have an opinion at least about her truthfulness." 1 VRP at 39. When asked if he or she could "weigh [the officer's] testimony just as you could weigh anybody else's testimony," the venire member replied, "I don't really know." 1 VRP at 39. When the trial court asked whether the member "would . . try to do that," the venire member replied, "Yeah." 1 VRP at 39. Another member of the venire acknowledged having had a personal experience "as a victim, witness, or as a defendant with a similar or related type of case," but answered "no" when asked whether that experience would affect his or her consideration of Rhoades's case. 1 VRP at 40. Both of these individuals ultimately served as jurors.[3]

## II. EVIDENCE AT TRIAL

At trial, the State presented evidence that Rhoades assaulted McLean, that Rhoades identified himself as "Spooker," an "LVL," and had asked if McLean were affiliated with a rival gang, which McLean denied. 1 VRP at 122-23; 2 VRP at 337-38. Holding a folding knife in his fist with the blade closed, Rhoades then punched and kicked McLean several times, knocking him to the ground. One of McLean's friends and two people accompanying Rhoades joined the fight, which lasted less than a minute.

---

[2] The State had included Huner, a participant in the fight giving rise to the charge against Rhoades, on its witness list, but had been unable to locate her.

[3] The record does not disclose whether Rhoades challenged either of these jurors for cause.

The police soon stopped the car carrying Rhoades and his friends and arrested Rhoades. Although Rhoades had no weapons, an officer found a folding pocket knife with a blade three and one-quarter inches long[4] on one of the other people in the car. McLean identified it as the same knife Rhoades held in his fist during the assault.

The defense called no witnesses. After offering one photo showing an injury Rhoades allegedly sustained during the fight, which the trial court admitted by stipulation, the defense rested.

### III. JURY INSTRUCTIONS AND CLOSING ARGUMENT

The court instructed the jurors that if they found Rhoades guilty of second degree assault, they must also decide whether he

> committed the offense with the intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang, its reputation, influence, or membership.

CP at 50. The jury received a corresponding special verdict form.

Also in its instructions to the jury, the trial court defined "recklessness" as follows:

> A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.

CP at 44. The court also submitted a special verdict form asking whether Rhoades was armed with a deadly weapon during the commission of the offense. Rhoades did not object to any of the instructions given or to the special verdict forms used.

Defense counsel argued in closing that the jury should acquit Rhoades of second degree assault because the State had proved neither that Rhoades had been armed with a deadly weapon

---

[4] For purposes of the deadly weapon enhancement, a deadly weapon includes any knife having a blade longer than three inches. RCW 9.94A.825.

during the attack nor that McLean suffered substantial bodily harm. Defense counsel also argued that the jury should not find the aggravating circumstance present because the State had failed to prove that Rhoades believed the crime would elevate his status in LVL.

## IV. VERDICT AND SENTENCE

The jury returned a guilty verdict, and answered "yes" to both special verdict form questions. CP at 61-64. The court entered judgment on the verdict and imposed an exceptional sentence of 110 months' confinement and 10 months' community custody. Rhoades timely appeals.

## ANALYSIS

### I. THE LACK OF ADEQUATE NOTICE OF THE AGGRAVATING CIRCUMSTANCE ON WHICH THE JURY WAS INSTRUCTED

Rhoades claims that the trial court violated his right to adequate notice of the nature and cause of the accusation against him. This is so, Rhoades contends, because (1) the court submitted to the jury an aggravating circumstance instruction, that Rhoades committed the crime with the intent to benefit a criminal street gang[5] ("gang aggravator"), which differed from the circumstance alleged in the information, that Rhoades committed the crime to obtain or maintain membership or advance his position in an identifiable group;[6] and (2) the State did not notify him before trial that it intended to seek an exceptional sentence based on the gang aggravator. Rhoades maintains that this amounted to a manifest constitutional error that he may raise for the first time on appeal under RAP 2.5(a)(3). Rhoades is correct in these contentions.

---

[5] RCW 9.94A.535(3)(aa).

[6] RCW 9.94A.535(3)(s).

5

A.    Manifest Error Affecting a Constitutional Right

RAP 2.5 allows appellate courts to refuse to address claims of error not raised in the trial court, with the exception that RAP 2.5(a)(3) allows a party to raise a "manifest error affecting a constitutional right" for the first time on appeal. In applying RAP 2.5(a)(3), we must first decide whether, assuming the truth of the appellant's allegations, the error "implicates a constitutional interest as compared to another form of trial error," and if so, whether the error is "manifest." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

The threshold test under RAP 2.5(a)(3) often overlaps with the analysis of the merits of the claimed error. *See State v. Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591 (2001) (stating that in determining whether an error is manifest, the appellate court "previews the merits of the claimed constitutional error to determine whether the argument is likely to succeed"). A "manifest" error results in "actual prejudice," namely "practical and identifiable consequences" at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011) (internal quotation marks omitted) (quoting *O'Hara*, 167 Wn.2d at 99).

In *O'Hara*, however, our Supreme Court clarified that "to ensure the actual prejudice and harmless error analyses are separate, the focus of the actual prejudice must be on whether the error is so obvious on the record that the error warrants appellate review." 167 Wn.2d at 99-100. "Thus, to determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *O'Hara*, 167 Wn.2d at 100.

The Washington and federal constitutions entitle criminal defendants to adequate notice of the nature and cause of the accusation, so that they may prepare a defense. *State v. Siers*, 174 Wn.2d 269, 277, 274 P.3d 358 (2012). To comport with these requirements, the defendant must

receive notice that the State seeks to prove an aggravating circumstance prior to the proceeding in which the State seeks to establish that circumstance. *Siers*, 174 Wn.2d at 277. The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, specifies that the State may give notice that it intends to seek a sentence above the standard range "[a]t any time prior to trial or entry of the guilty plea," and that "[t]he notice shall state aggravating circumstances upon which the requested sentence will be based." RCW 9.94A.537(1). As discussed, the record here establishes that at trial the State relied on an aggravating circumstance different from that alleged in the information. The alleged error plainly "affect[s] a constitutional right" within the meaning of RAP 2.5(a)(3).

RCW 9.94A.537(1) required the State to notify Rhoades before trial that it would seek an exceptional sentence based on the gang aggravator. The *Siers* decision clearly articulated this as a requirement prior to Rhoades's trial. 174 Wn.2d at 277. The record here contains no evidence that the State gave Rhoades notice before trial of its intent to seek an exceptional sentence based on the RCW 9.94A.535(3)(aa) gang aggravator. Additionally, the record contains no evidence that Rhoades waived his right to receive such notice, and we may not presume waiver of important constitutional rights from a silent record. *See State v. Rinier*, 93 Wn.2d 309, 315, 609 P.2d 1358 (1980); *State v. Williams*, 87 Wn.2d 916, 921, 557 P.2d 1311 (1976); *State v. McFarland*, 84 Wn.2d 391, 401, 526 P.2d 361 (1974) (Stafford, J. dissenting).

Thus, the record makes the alleged error sufficiently obvious to warrant appellate review since it establishes that, "given what the trial court knew at that time, the court could have corrected the error." *O'Hara*, 167 Wn.2d at 100. The error Rhoades alleges affects a constitutional right and is "manifest" within the meaning of RAP 2.5(a)(3). We turn to the merits of the claim.

B.  The Right to Adequate Notice of the Charges

We review de novo a claim that a criminal defendant received inadequate notice of the nature and cause of the accusation. *Siers*, 174 Wn.2d at 273-74. It is well established that all essential elements of a crime must be included in a charging document "'to give notice to an accused of the nature of the crime that he or she must be prepared to defend against.'" *State v. Zillyette*, 178 Wn.2d 153, 158-59, 307 P.3d 712 (2013) (quoting *State v. Kjorsvik*, 117 Wn.2d 93, 101, 812 P.2d 86 (1991)). Our Supreme Court has held, though, that "an aggravating factor is not the functional equivalent of an essential element and need not be charged in the information." *Siers*, 174 Wn.2d at 282.

The *Siers* court instead held that "so long as a defendant receives constitutionally adequate notice . . . , 'the absence of an allegation of aggravating circumstances in the information [does] not violate [the defendant's] rights under'" the federal and Washington constitutions. *Siers*, 174 Wn.2d at 276-77 (quoting *State v. Powell*, 167 Wn.2d 672, 687, 223 P.3d 493 (2009) (plurality opinion)). To receive adequate notice of an aggravating circumstance, the court held that the defendant need only "receive notice prior to the proceeding in which the State seeks to prove those circumstances to a jury." *Siers*, 174 Wn.2d at 277 (citing *State v. Schaffer*, 120 Wn.2d 616, 620, 845 P.2d 281 (1993)). Because "Siers's attorney acknowledged that the State had provided notice to Siers prior to trial that it intended to prove an aggravator that could result in an exceptional sentence," the court reinstated Siers's conviction. *Siers*, 174 Wn.2d at 277, 282-83.

Thus, under *Siers*, 174 Wn.2d at 276-77, we must reject Rhoades's argument that the trial court erred in submitting the gang aggravator to the jury because the State did not include it in the information. The facts in *Siers* make clear, however, that the State had notified Siers prior to

trial of its intent to rely on the same aggravating circumstance that the trial court actually submitted to the jury. *Siers*, 174 Wn.2d at 272-73 & n.1. The question remains, then, whether the State's inclusion in the information of a circumstance other than the gang aggravator, combined with its pretrial motion to introduce evidence of Rhoades's gang affiliation for the purpose of establishing motive, gave Rhoades constitutionally sufficient notice that the State would seek an exceptional sentence based on the gang aggravator.

The notice requirement serves to ensure that criminal defendants have the opportunity to prepare an adequate defense against the State's allegation of an aggravating circumstance. *Siers*, 174 Wn.2d at 277. Although the two aggravators at issue share certain similarities, the manner in which one might defend against them could differ substantially. Of greatest significance here, the aggravator alleged in the information focuses on benefit to the defendant: whether in committing the crime the defendant aimed to "obtain or maintain his or her membership or to advance his or her position in the hierarchy of an organization, association, or identifiable group." RCW 9.94A.535(3)(s). The gang aggravator, in contrast, focuses on benefit to the gang: whether the defendant intended "to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang . . . , its reputation, influence, or membership." RCW 9.94A.535(3)(aa).

Evidence that a criminal act did not tend to improve the defendant's status in a gang would not necessarily bear on whether the act might have benefitted the gang itself, and vice versa. On its face, then, the substitution of one aggravator for the other resulted in inadequate notice that likely prejudiced the defendant's ability to prepare a defense.

That Rhoades knew the State intended to introduce evidence that his gang affiliation motivated the attack on McLean does not cure this prejudice. While establishing motive is a

9

proper purpose for the admission of gang evidence, such motive is not actually an element of second degree assault. *State v. Yarbrough*, 151 Wn. App. 66, 83-87, 210 P.3d 1029 (2009). Here, the defense strategy focused on disputing whether the defendant was armed with a deadly weapon or inflicted substantial bodily harm. Given that strategy, and without any other indication that the gang aggravator would be pursued, defense counsel may well have seen little point in contesting whether the attack was gang motivated. Indeed, defense counsel plainly sought in cross examination and closing argument to dispute that the attack tended to elevate Rhoades's status in LVL, consistently with the charged aggravator; but never disputed that Rhoades was a member of the gang or that he intended the attack to benefit it.

For these reasons, Rhoades's knowledge that the State would introduce evidence of gang affiliation did not give him notice that the State would pursue an aggravator other than that charged in the information. For these reasons also, that lack of notice prejudiced the preparation of Rhoades's defense.

Because Rhoades did not receive adequate notice prior to trial that the State intended to seek an exceptional sentence based on the gang aggravator, and the lack of notice prejudiced him in preparing a defense, the submission of that aggravator to the jury amounted to constitutional error. *See Siers*, 174 Wn.2d at 276-77. The State, which bears the burden of proving constitutional error harmless beyond a reasonable doubt, *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013), presents no harmless error argument in its brief. Regardless, this type of error is not susceptible to constitutional harmless error analysis. *State v. Recuenco*, 163 Wn.2d 428, 441-42, 180 P.3d 1276 (2008). We reverse Rhoades's exceptional sentence.

## II. THE TRIAL COURT'S RECKLESSNESS INSTRUCTION

Rhoades argues that the trial court's jury instruction defining recklessness, which informed the jury that "'[a] person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that *a wrongful act* may occur,'" relieved the State of the burden of proving an essential element of second degree assault. Br. of Appellant at 12-21 (quoting CP at 44) (emphasis added). That is, the jury could have relied on Rhoades's disregard of a substantial risk that any wrongful act might occur, instead of the actual prohibited result, substantial bodily harm. We disagree.

In *State v. Johnson*, our Supreme Court addressed the exact question presented here:

> Taken in their entirety, the instructions in this case were sufficient. The "to convict" instruction properly laid out the elements of the crime. It identified the wrongful act contemplated by Johnson as "substantial bodily harm." Separately providing a generic definition of "reckless" did not relieve the State of its burden of proof. The "to convict" instructions are the primary "yardstick" the jury uses to measure culpability, and here they were accurate.

180 Wn.2d 295, 306, 325 P.3d 135 (2014). Here, the to-convict instruction also correctly identified substantial bodily harm as the prohibited result. Under *Johnson*, the instructions were not erroneous.

## III. DENIAL OF RHOADES'S REQUESTS FOR A CONTINUANCE

In his statement of additional grounds (SAG), Rhoades contends that the trial court erred in denying two defense requests for a continuance. Specifically, Rhoades argues that the error denied him the right to present a defense because it prevented his attorney from locating a key witness, properly interviewing the State's witnesses, and otherwise adequately preparing for trial. Because the trial court based its decision on proper grounds, supported by the record, and Rhoades fails to make a sufficient showing of prejudice, we reject the claim.

We review the denial of a motion for continuance under the abuse-of-discretion standard. *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004). To prevail on such a claim, a party must "make[] 'a clear showing'" that the trial court's exercise of discretion was "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Downing*, 151 Wn.2d at 272-73 (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

The factors a trial court may consider in ruling on a motion for a continuance include "surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure." *Downing*, 151 Wn.2d at 273 (citing *State v. Eller*, 84 Wn.2d 90, 95, 524 P.2d 242 (1974)). A party establishes that the trial court abused its discretion in denying a continuance motion by showing "that the accused has been prejudiced and/or that the result of the trial would likely have been different had the continuance not been denied." *Eller*, 84 Wn.2d at 95. "[T]here are no mechanical tests for deciding when the denial of a continuance violates due process, inhibits a defense, or conceivably projects a different result," but "the answer must be found in the circumstances present in the particular case." *Eller*, 84 Wn.2d at 96.

Rhoades first requested a continuance at the trial confirmation hearing, one week before trial commenced. The State acknowledged at the hearing that it had not given McLean's contact information to defense counsel, because it wanted to protect McLean from alleged attempts at intimidation. Defense counsel also represented at the trial confirmation hearing that he had only recently learned that a witness, one of the participants in the fight who had been in the car with Rhoades, would testify for the State as part of a plea deal. Rhoades's attorney stated that he had not had an opportunity to interview the witness, who was represented by counsel, and had not seen the plea deal.

12

At the same hearing, the defense attorney also stated that "there's some new police reports that have come in I haven't had a chance to review it, came in yesterday." VRP (April 18, 2013) at 2. The court denied the request for a continuance, ordered Rhoades taken into custody, and confirmed the trial date, but also ordered the State to make McLean and the other witness available for interviews.

On the first day of trial, Rhoades asked again for a continuance. Based on the interview with McLean, Rhoades wished to call an additional witness, Huner, another participant in the fight. The State had included Huner on its witness list, but never managed to locate her. Defense counsel stated that he had not sought to contact Huner because he expected her testimony to "cut[] both ways," but that, given what he had heard from McLean, Rhoades thought Huner's testimony would do more good for the defense than harm. 1 VRP at 7-8.

The prosecutor acknowledged that Huner qualified as a material witness, but opposed the motion on the grounds that (1) Rhoades would have no better chance of locating her than the State, which had devoted considerable resources to the effort without avail, and (2) a continuance would prejudice the State because its witnesses were "terrified" of Rhoades and "a lot of times this is used as a strategy to continue things so that witnesses disappear." 1 VRP at 9-11. The court denied the motion for the reasons articulated by the prosecutor, pointing out that certain "witnesses for the State . . . are in protective custody." 1 VRP at 13.

To decide whether denial of the continuances in these circumstances was an abuse of discretion, we turn first to *State v. Oughton*, 26 Wn. App. 74, 612 P.2d 812 (1980). There, the State learned during trial that a witness would give additional incriminating testimony not disclosed to the defense, but did not inform defense counsel. *Oughton*, 26 Wn. App. at 78. Upon hearing this testimony, Oughton requested a continuance for the purpose of obtaining

13

evidence to rebut it, which the court denied. *Oughton*, 26 Wn. App. at 78. Even though (1) the undisclosed evidence did not directly implicate Oughton, (2) Oughton never articulated what evidence he hoped to offer in rebuttal, and (3) his defense was implausible at best, we held that the trial court had abused its discretion in denying the requested continuance and that reversal was warranted. *Oughton*, 26 Wn. App. at 75, 76, 79-80, 85. We noted that, "no matter how incredible a given defendant's story may sound, due process entitles him to a fair chance to get his version of the events before the jury so that they may make an unprejudiced decision." *Oughton*, 26 Wn. App. at 75.

Rhoades's argument would appear at first glance to have some force under *Oughton* because the perceived need for Huner's testimony apparently did not arise until the State made McLean available for an interview. A number of facts distinguish this case from *Oughton*, however.

Perhaps most importantly, Rhoades does not show that the denial of a continuance prejudiced him. Rhoades did not explain how he could have located Huner when the State could not and acknowledged that her testimony would have "cut[] both ways." 1 VRP at 8. Since Huner was apparently also a suspect and likely faced charges, it is doubtful at best that Rhoades could have secured her testimony.

Further, delay would be more prejudicial to the administration of justice here than it was in *Oughton*. Nothing indicates that witnesses were being held in custody in that case, nor were there allegations there that the defendant or his associates were seeking to intimidate witnesses, as the State alleged here.

In denying the continuances, the trial court relied on the sort of considerations approved by *Downing*, 151 Wn.2d at 273, for that purpose. Further, Rhoades fails to show that the denial

14

of a continuance prejudiced his defense, a central consideration in *Eller*, 84 Wn.2d at 95-96.

Thus, the trial court did not abuse its discretion in denying the continuances.

IV. ADMISSION OF GANG EVIDENCE

Rhoades also contends that the trial court erred in permitting Detective Patrick Fitzgerald

to testify concerning gangs generally and Rhoades's gang affiliation in particular. Specifically,

Rhoades argues that, because the trial court refused to rule that Fitzgerald qualified as an expert

on street gangs, much of the detective's testimony concerning gangs in general was improper.

Rhoades further argues that Fitzgerald's testimony exceeded the scope of the trial court's ruling

on the State's motion in limine and invaded the province of the jury.

As noted, in its order on the State's motion to admit gang evidence, the trial court

permitted evidence of Rhoades's gang affiliation offered to show motive, intent, and/or res

gestae, as well as expert testimony regarding gang culture and background relating to LVL. The

order prohibited evidence specifically related to Rhoades's prior bad acts in association with his

gang affiliation.

After inquiring into Fitzgerald's gang-related training and experience at trial, the State

asked the court to rule that he qualified as "an expert in the area of street gangs." 2 VRP at 334.

The defense objected as follows: "I think that's improper, so I'll object to that. But I'm not

opposed to what he has to say." 2 VRP at 334. The trial court responded, "You can just ask the

witness your questions. I'm not going to make that ruling." 2 VRP at 334. Fitzgerald proceeded

to describe, without objection, the culture and activities of gangs generally and LVL in

particular.

The State also asked whether Fitzgerald was familiar with Rhoades in particular, and

Fitzgerald replied affirmatively. Fitzgerald proceeded to testify to his knowledge of Rhoades's

15

affiliation with LVL, including Rhoades's allegedly gang-related tattoos. Finally, Fitzgerald gave the opinion that "the assault on Mr. McLean . . . was in association with a gang . . . [g]iven the [verbal] interaction that transpired before the actual assault." 2 VRP at 344. The defense did not object to any of this testimony.

Rhoades does not show that he is entitled to raise this issue for the first time on appeal. Because the First Amendment right of association protects gang affiliation, just as it does "membership in a church, social club, or community organization," Rhoades has at least a plausible argument that the alleged error affects a constitutional right within the meaning of RAP 2.5(a). *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009) (citing *Dawson v. Delaware*, 503 U.S. 159, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992)). Rhoades points to nothing in the record, however, establishing that any error occurred, let alone "manifest" error, as RAP 2.5(a)(3) would require.

Although Washington courts recognize that gang affiliation evidence inherently poses a risk of unfair prejudice, courts may nonetheless properly admit it to show motive or intent where the proponent establishes "a nexus between the crime and the gang."[7] *State v. Embry*, 171 Wn. App. 714, 731-32, 287 P.3d 648 (2012), *review denied*, 177 Wn.2d 1005 (2013); *accord Yarbrough*, 151 Wn. App. at 81-89; *Scott*, 151 Wn. App. at 526-29. Thus, in order to admit such evidence, the trial court must

> (1) find by a preponderance of the evidence that misconduct occurred; (2) identify the purpose for which the evidence is sought to be introduced; (3) determine whether the evidence is relevant to prove an element of the crime charged; and (4) weigh the probative value against the prejudicial effect.

---

[7] Because aggravating circumstances that support a sentence beyond the standard range are the functional equivalent of elements of a greater crime, *Ring v. Arizona*, 536 U.S. 584, 604-05, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), *Blakely v. Washington*, 542 U.S. 296, 304-05, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), this nexus plainly exists where the State alleges a gang aggravator. ER 401.

*Embry*, 171 Wn. App. at 732. We will not reverse a trial court's ruling under "ER 404(b) . . . absent a manifest abuse of discretion such that no reasonable judge would have ruled as the trial court did." *State v. Mason*, 160 Wn.2d 910, 933-34, 162 P.3d 396 (2007).

Here, the trial court held a hearing on the matter and concluded that, based on Rhoades's statements to McLean at the beginning of the fight, the evidence was admissible and offered for proper purposes. The evidence plainly had some tendency to make more likely the existence of a fact of consequence to the determination of the action, and was thus relevant. ER 401. The court explicitly considered the risk of unfair prejudice and concluded that the probative value of the gang evidence outweighed it, nonetheless excluding evidence of specific "prior bad acts in association with his gang affiliation." CP at 20. Fitzgerald's testimony generally conformed to the trial court's ruling.

To the extent that certain testimony regarding Rhoades's gang membership may have exceeded the scope of the court's order, any error is not "so obvious on the record that the error warrants appellate review." *O'Hara*, 167 Wn.2d at 99-100. That is, "given what the trial court knew at that time," it is not reasonable to expect the court to have corrected any such error absent a timely and specific objection. *O'Hara*, 167 Wn.2d at 100.

Thus, even assuming Rhoades raises an error truly of constitutional magnitude, it did not have "practical and identifiable" consequences at trial as articulated by the *O'Hara* court, 167 Wn.2d at 99, and would therefore not qualify as "manifest" within the meaning of RAP 2.5(a)(3). We decline to address the issue further.

## V. JUROR BIAS

Rhoades contends that the trial court erred in allowing two venire members to serve on the jury. Because the record does not establish whether Rhoades challenged either juror for cause, we decline to reach the claim.

One of the allegedly biased jurors knew one of the investigating officers and the other juror acknowledged having had a personal experience with a similar or related crime. The court sought to rehabilitate the first juror as follows:

> THE COURT: Anything about that acquaintanceship that would cause you to place any more weight or any less weight on her testimony? Would that impact you in any way?
> JUROR NO. 19: I think it would. You know, I know her well enough to have an opinion at least about her truthfulness or, you know. . . .
> THE COURT: All right. Is that something that you could bring into the mix, you could weigh that and weigh her testimony just as you could weigh anybody else's testimony?
> JUROR NO. 19: I don't really know.
> THE COURT: I'll ask you this: would you try to do that?
> JUROR NO. 19: Yeah.

1 VRP at 39. The court also asked the second juror if anything about the juror's personal experience with a related crime would affect his or her consideration of the case, to which the juror replied, "No, sir." 1 VRP at 40.

The record does not disclose whether Rhoades challenged either juror for cause. In *State v. Reid*, we held that "[a] party accepting a juror without exercising its available challenges cannot later challenge that juror's inclusion." 40 Wn. App. 319, 322, 698 P.2d 588 (1985) (citing *State v. Jahns*, 61 Wash. 636, 112 P. 747 (1911)). Thus, we cannot reach the challenges to either juror without delving into matters outside the record before us. We therefore decline to address them further. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Rhoades further contends that his trial attorney rendered ineffective assistance, depriving Rhoades of his right to counsel. Specifically, Rhoades argues that defense counsel's performance was deficient because the attorney (1) failed to interview witnesses, maintain communication with Rhoades, or otherwise conduct an adequate pretrial investigation, (2) did not make an opening statement, (3) failed to request an instruction on third degree assault as an included offense, (4) referred to Rhoades by his alleged gang moniker during the trial, (5) failed to object to the State's request for an instruction on accomplice liability, and (6) represented Rhoades despite the fact the attorney, a former Lewis County Deputy Prosecutor, previously prosecuted other alleged LVL members and represented the State in a trial at which McLean also testified. Regarding the sentencing hearing, Rhoades further contends that his attorney (7) called no witnesses, (8) failed to argue that Rhoades did not have the ability to pay legal financial obligations, (9) "barely argued for the low range," and (10) requested $2,400 in attorney fees despite having done little or no trial preparation. SAG at 8-9.

We review claims of ineffective assistance de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on such a claim, a defendant must show both deficient performance by defense counsel and prejudice caused by the deficiency. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Courts apply "a strong presumption that defense counsel's conduct is not deficient." *Reichenbach*, 153 Wn.2d at 130. A defendant may rebut that presumption by showing "no conceivable legitimate tactic explaining counsel's performance." *Reichenbach*, 153 Wn.2d at 130.

Establishing prejudice requires that the defendant show a reasonable possibility that the outcome of the proceeding would have differed absent counsel's purportedly deficient conduct.

19

*Reichenbach*, 153 Wn.2d at 130. A "reasonable probability" in this context is one "sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Rhoades's arguments concerning his attorney's alleged conflicts of interest and lack of trial preparation depend on matters outside the record. We therefore decline to reach them. *McFarland*, 127 Wn.2d at 335.

The record does reveal that defense counsel continuously referred to Rhoades as "Spooker" in the presence of the jury while cross-examining McLean. 1 VRP at 138, 140, 144, 146, 149-150, 161, 164-166, 171. Given that McLean also repeatedly referred to Rhoades by that name, and the State called several other witnesses who also testified to Rhoades's alias, this was a conceivably legitimate tactic to "take the sting out" of the alleged gang moniker.

The record discloses that Rhoades's attorney did not give an opening statement. Our Supreme Court has held, however, that defense counsel's waiver of opening statement does not constitute deficient performance, even in a capital trial. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 715, 101 P.3d 1 (2004).

The record also shows that defense counsel did not object to the State's request for an accomplice liability instruction. As Rhoades's attorney noted during the jury instruction discussion, the evidence showed that two other people from the car carrying Rhoades also participated in the fight, creating an adequate basis for such an instruction. Further, courts do not consider accomplice liability an element of or alternative means of committing a crime and it thus need not appear in the information. *State v. Teal*, 117 Wn. App. 831, 838, 73 P.3d 402 (2003). For these reasons, the trial court would surely have overruled an objection to the requested accomplice liability instruction. Thus, his attorney's failure to object was not

unreasonable, and Rhoades could not show prejudice in any event. *See McFarland*, 127 Wn.2d at 337 n.4.

The record supports Rhoades's allegation that his attorney did not request an instruction on third degree assault as an included offense, but instead requested only a fourth degree assault instruction, which instruction the court gave without objection. As an initial matter, this may well have qualified as a legitimate tactical decision. *See State v. Grier*, 171 Wn.2d 17, 44-45, 246 P.3d 1260 (2011) (holding that failure to request included-offense instruction did not necessarily establish deficient performance and compiling cases).

More importantly, Rhoades was not entitled to such an instruction. To create a duty to instruct the jury on an included offense, the evidence must raise an inference that the defendant committed only the included offense and not the charged offense. *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000); *State v. Workman*, 90 Wn.2d 443, 447-49, 584 P.2d 382 (1978). Thus, to convict Rhoades of third degree assault under the facts presented here, the jury would needed to have found that he acted only with criminal negligence, not intent. RCW 9A.36.031(d), (f). All the witnesses to the fight testified that Rhoades intentionally punched and kicked McLean, so there was no evidence giving rise to a reasonable inference that Rhoades acted only with criminal negligence. Defense counsel did not perform deficiently by failing to request an instruction to which Rhoades was not entitled.

The record further establishes that Rhoades's attorney did not call witnesses at the sentencing hearing or argue that Rhoades would be unable to pay legal financial obligations. The decision whether to call witnesses is generally recognized as a matter of trial strategy left to the discretion of defense counsel, American Bar Association, *Standards for Criminal Justice: Defense Function*, std. 4-5.2(b), at 200 (3d ed. 1993), and Rhoades does not explain what

testimony his attorney should have offered or why. The trial court found that Rhoades had the ability to pay the legal financial obligations "through employment in [the] Department of Corrections." VRP (July 10, 2013) at 472. Rhoades points to nothing in the record that his attorney could have used to undermine this finding. Since Rhoades is 34 years old, and would appear from the facts of this case to be able-bodied, the record adequately supports the court's finding.

Rhoades fails to make a sufficient showing from the record on review that counsel's performance was deficient or that any alleged deficiency was prejudicial. His claims of ineffective assistance therefore fail.

## VII. PROSECUTORIAL MISCONDUCT

Rhoades contends that prosecutorial misconduct deprived him of a fair trial. Specifically, Rhoades contends that the prosecutor (1) failed to make McLean available for an interview until ordered to do so shortly before trial, (2) improperly instructed jail staff to suspend all of Rhoades's phone privileges, preventing him from contacting his attorney during a critical stage of trial preparation, and (3) failed to disclose that one of the State's witnesses testified in exchange for a plea bargain. Because the merit of each of these contentions depends on matters outside the record, we decline to address them. *McFarland*, 127 Wn.2d at 335.

## CONCLUSION

The State did not provide constitutionally sufficient notice of its intent to seek an exceptional sentence based on the RCW 9.94A.535(3)(aa) gang aggravator. Therefore, we reverse Rhoades's exceptional sentence and remand for resentencing within the standard range.

No. 45083-6-II

We reject Rhoades's other claims and otherwise affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, A.C.J.

We concur:

Maxa, J.

Melnick, J.